(36 South. 943.)

No. 13,347.

CHAFFE v. BARATARIA CANNING CO.*

(Nov. 3, 1903.)

APPEAL — REVIEW — CONFLICTING EVIDENCE— CONTRACT—RIGHTS OF PARTIES—CONSTRUCTION—AGENT—RATIFICATION OF ACTS.

1. The issues in this case were issues of fact, which were upon conflicting testimony decided by the judge in favor of the defendant. Where the appellate court finds, as did the court below, the preponderance of testimony adverse to the plaintiff's claims, and there is nothing in the record to break the force of the judge's conclusions as to the weight of evidence, the upper court would not be warranted in altering or reversing the judgment.

2. The rights and obligations of the parties to a contract are to be tested by the actual facts of the case as disclosed by the evidence. Errors in bookkeeping amount to nothing, when remedied by testimony aliunde.

3. Though it was understood between the parties to the verbal contract which they made that the bulk of the molasses business of the concern was to be conducted by the plaintiff at his individual office, that matter did not enter into the contract as forming one of its terms or conditions. The plaintiff not being personally liable for any losses in the business, and his remuneration being a share in the net profits of the venture, defendant was under no legal obligation to forego the benefits which would accrue to it, by lessening expenses by changing the place for conducting the business to its own factory, through consideration for the plaintiff, in absence of a contract upon that subject. As defendant had the right to discontinue the business at will, the question as to whether plaintiff's refusal to comply with an order to change his office would under different circumstances have justified the termination of the relations between the parties, is a matter of no moment.

4. As between plaintiff and defendant, the former, as the latter's manager, was bound not to make purchases on the latter's behalf beyond a certain limit. This limitation was not made known to others. Plaintiff went beyond the limit, and defendant was forced to take the goods and pay the price. Plaintiff claimed that in so doing defendant, in its relations with himself, ratified his action, and it was bound to give him all the benefit which might subsequently result from the unauthorized purchase. Defendant's acceptance of the situation was forced upon it. It was not, quoad the plaintiff, a ratification of his acts.

(Syllabus by the Court.)

---

*Rehearing denied June 29, 1904.

Appeal from Civil District Court, Parish of Orleans; Walter Byers Sommerville, Judge.

Action by Robert H. Chaffe against the Barataria Canning Company. Judgment for defendant, and plaintiff appeals. Affirmed.

Wickliffe & Falls, for appellant. Saunders & Gurley, for appellee.

Statement of the Case.

NICHOLLS, C. J. Plaintiff asks judgment against the defendant for the sum of $3,603.39.

The district court rendered judgment in favor of the defendant and against plaintiff, dismissing his suit, with costs, and in favor of plaintiff against defendant, dismissing a reconventional demand, which it filed against plaintiff, at its costs. It decreed that a fee of $200 be paid for the services of James A. Renshaw, the expert appointed by the court, to be taxed as costs, and that the fees of the stenographer be fixed at $637 and paid as costs.

After an unsuccessful attempt to obtain a new trial, plaintiff appealed. Plaintiff's demand was based upon the claim that he had in June, July, or August, 1900, entered into a contract with defendant by the terms of which he and the defendant were to engage in the molasses business in the city of New Orleans on joint account on the following terms and conditions:

He was to be the manager of the molasses department and supervisor of brokers "of the defendant company," and to have control and direction of all of said molasses business; that the office of said business was to be located at No. 331 South Front street, in the city of New Orleans, which was his own office; that all the business of buying and selling molasses should be from said office; that the business was to be done in his name as manager of said department; that all of the expenses of the office were to be paid by defendant, and it was also to supply him with

all the clerical help necessary to conduct and carry on the same; that defendant was to pay him a reasonable remuneration for his work during the months of July, August, and September, 1900, in doing the necessary preliminary work to establish and put on foot the business, which reasonable remuneration would be the sum of $150 per month, amounting to the sum of $450; that defendant. was to pay him 1 per cent. on the amount received for all canned molasses and syrup sold by it, and to pay him 10 cents per barrel on all molasses and syrup bought by it for canning; that on all the transactions on all molasses and syrup in barrels and in bulk defendant was to have and receive 66⅔ per cent. of the net profits, and he was to have and receive 33⅓ per cent. of said profits of said business; that defendant agreed to advance and pay him the sum of $20 per week for living expenses until such time as said profits should accrue, said amounts to be deducted from the one-third of his share of said profits when the same should have been realized; that by said agreement he was to give to said business his skill and knowledge, and to manage and conduct and build up same, and defendant was to furnish the necessary capital to conduct and carry on the same; that he had performed all of his part of the agreement in letter and spirit, and had done all things required thereby as well as he could, under the failure and refusal of the defendant to comply with its part of the agreement.

That it refused to comply with its part of the agreement, although called upon to do so.

That defendant never furnished him the necessary clerical and other help to properly conduct and carry on the business at said office No. 331 South Front street, but only paid a small amount each week from October 1, 1900, until January 26, 1901, when it refused to pay anything further for the expenses of the office, and ordered him to close and discontinue same, and to report to the office of the company at the extreme lowest part of

the city to do the work which could not be done therefrom; that on December 15, 1900, defendant refused to allow him to buy goods necessary to fill orders which the business had, and directed him to buy nothing more of any sort until he got further orders from it, which further orders it never gave and did not intend to give; that defendant had paid him $20 per week as agreed upon only for four weeks, when it refused to pay him more than $15 per week until January 26, 1901, when it refused to, and still refuses to, pay him anything at all.

That the defendant, its officers, and employés had refused and continued to refuse to permit him to inspect the books of the company showing its molasses and syrup business during the time his contract had been in existence, though requested so to do; that on January 29th the defendant refused to any further carry on business with him.

That said business by the original agreement was to continue at least one year from the 1st of September, 1900; that there was due him by defendant the sum of $59.39 for expenses of the office for the weeks ending February 2, February 9, and February 16, 1901, and the sum of $24 balance as brokerage for molasses bought by him for the canning department of the company; that he believed and charged there was due him at least $50 brokerage on molasses and syrup sold by it since said agreement; that there was due him $550 as one-third of the net profits on the bulk and barrel molasses and syrup business due under contract and shipped up to 1st of January, 1901; that there was due him the sum of $250 as one-third of the net profits of the bulk and barrel molasses and syrup business contracted for and sold, but not shipped, on January 1, 1901; that defendant had refused to fill and ship orders for molasses and syrup in barrels and bulk obtained by him, the net profits upon which would have amounted to the sum of $1,750, and the defendant had prevented him from

making his share of the said net profits, which would have amounted to $250, and therefore it was liable to him for said amount.

That had said company carried out the contract with him as set out, and done and performed what it had agreed to do, the net profits of the business in bulk and barrel molasses which would have been done for joint account between the 1st of January and the 1st of September, 1901, would have amounted to the sum of $6,000, of which amount one-third, or the sum of $2,000, would have belonged to him, and he had been deprived of said amount by the action of the company, its officers, and employés; that he had been damaged to the amounts set out by the failure of the defendant to carry out its agreement; that he was entitled to have the books of the company produced and inspected, to the end that the amount of the business done by it under the contract should be ascertained with certainty.

Defendant answered, pleading first the general issue.

It admitted that it had entered into a contract with the plaintiff, but denied that it was a contract such as was set out in the petition. It averred it was a verbal contract, without any limit as to time, and purely at its pleasure. It specially denied that there was any agreement of compensation, except upon a commission and net profit basis after all expenses and losses had been deducted. It denied that there was any agreement to pay such expenses, office rent, or anything else, except stenographer and mixer, which it did pay. It denied it had agreed to pay $20 per week (which sum it voluntarily paid for a while at its option), or any other sum, except a commission of 10 cents per barrel brokerage on all molasses used for canning purposes and 1 per cent. brokerage on all sales of molasses in cans. It alleged that it had advanced to the plaintiff, at his earnest solicitation and request, and without any obligation so to do, the sum

of $250, which sum far exceeded any commission earned by him. It admitted that it did on the 1st of February, 1901, terminate— as it had the legal right to do—the agreement between itself and the plaintiff; that it had the right, and exercised it, particularly because of the refusal of the plaintiff to comply with instructions regarding the purchase of molasses and regarding the moving of his office.

Defendant alleged that plaintiff had illegally and unlawfully refused to surrender to it the correspondence pertaining to its business or to give it access to the same.

It averred that there was then in hand a large stock of molasses illegally and wrongfully purchased by plaintiff against its orders and instructions. It averred it was willing to pay plaintiff the agreed commission on any of this molasses which he would sell.

Assuming the position of plaintiff in reconvention, defendant asked judgment against plaintiff for the sum of $526.23, averring that it had advanced him the sum of $555.13; that there was due to the plaintiff only the sum of $28.90, and it was entitled to recover back the difference—the sum of $526.23.

Defendant abandoned the reconventional demand on the trial.

On motion of the plaintiff the court appointed James A. Renshaw as an expert to examine the books and papers produced upon subpœnas duces tecum which had issued, and to report to it the state of the accounts between the parties as shown thereby.

The expert, so appointed, made a lengthy detailed statement of the state of such accounts.

The district judge assigned the following reasons in support of the judgment it rendered:

"Robert H. Chaffe bases this suit against the Barataria Canning Company, upon a verbal contract, which is admitted by the company. The evidence, which consumed 12 days in the taking and which covers 850 pages of typewrit-

ing and a trunk full of books and papers, fails to disclose when this contract was entered into, that it was to cover any fixed term, the nature or rather the extent of the business to be carried on, or the compensation to be paid to plaintiff.

"The Barataria Company was and is engaged in the business of canning oysters, shrimps, crabs, fruits, vegetables, etc., in the town of Biloxi, Miss., with an office in the city of New Orleans. In 1900, the company, desiring to extend its business in the canning of molasses, and to carry on a limited bulk molasses business in connection with its other branches, secured the services of Mr. Robt. H. Chaffe. He was to give his knowledge of blending molasses for the canning department without extra compensation. He was to be manager of the bulk molasses department for 30 per cent. of the net profits of the business, although he claims 33⅓ per cent. therefor. The preponderance of evidence established the former rate of compensation.

"He was also to receive brokerage of 10 cents per barrel of molasses bought for the canning department, which amounted to $28.05, and 1 per cent. commissions on sales of canned molasses, which amounted to $40.

"The claim for remuneration during the months of July, August, and September, 1900, at the rate of $150 per month will not be allowed. The work was done after the contract was entered into, according to Chaffe's allegation. In his petition he says: 'In the months of June, July, and August, 1900, he entered into a contract with the Barataria Canning Company. The work was preparatory to the business to be done as soon as the sugar crop of the state began to move, and the 30 per cent. of the net profits of the business was to compensate him for that work. Besides, the preparatory work was not worth $450. Could it be considered as extra work?

"The claim for office expenses during the month of February will not be allowed, for the reason that the contract had been terminated January 31, 1901. Besides the evidence shows that the company was not to pay Chaffe's office expenses, although it had done so for a time because of the small business done by Chaffe.

"As before stated, the evidence does not support Mr. Chaffe's allegation that the contract was to extend throughout the year. The preponderance of evidence is to the effect that the bulk molasses business was merely experimental, and to be run in connection with the canning department. The intention of the company being to buy lots of molasses, to use what might be necessary for canning purposes, and to sell the balance of the lots, enabling them to get the desired grades and to speculate upon what might be left in stock. If the venture proved successful, the company contemplated extending that branch of its business, and Mr. Chaffe would have benefited thereby, as he was to be paid a portion of the profits for his services. The enterprise was entirely under the control of the company at all times; so, also, were Mr. Chaffe and his services. Mr. Chaffe's services were

finally dispensed with January 31, 1901; although the company through its officers appears to have declared their relations terminated some time previously. But the fixing of the term of the contract became unnecessary, for the reason that Mr. Chaffe gave sufficient cause to the company to terminate same when it did. Mr. Chaffe did not obey instructions. He bought lots of molasses against positive orders not to do so, and insisted upon carrying a stock far beyond 200 barrels, the limit fixed by the company. He by his conduct made it impossible to execute the contract, and he is alone to blame for the action of the company in severing business relations with him on January 31, 1901. His claim, therefore, for actual and prospective profits after January 31, 1901, will be disallowed. .

"There remains only for consideration the results of the bulk molasses business during the months preceding February 1, 1901. An expert was appointed by the court to examine and report upon the books of the Barataria Canning Company. He divided his report into parts A, B, and C. The letter C covers transactions of the company subsequent to Mr. Chaffe's separation from it, and will not be considered. Part B covers sales made after January 31, 1901, of molasses bought previous thereto by Chaffe. These sales should not have figured in the report; but as the amounts do not materially change the result, and as another report would be expensive and further delay a settlement between the parties, it is allowed to stand.

"The expert's report shows that the gross profits of the bulk molasses business amounted to $3,989.18. Part A, $2,783.44, p. 22, and part B, $1,205.74, p. 26.

"The expert's report shows that the expenses placed in the 'joint' account columns amounted to $2,655.14. Part A, $1,936.26, p. 22; and part B, $718.88, p. 26.

"The foregoing figures of expenses are now used in disposing of this case, not because they are correct, but simply as a basis of settlement. They are not correct. They represent only those amounts not contested by Mr. Chaffe. They should be increased by at least $700, placed by the expert in the columns headed 'disputed,' when they should have been placed in the column headed 'joint.'

"Deduct joint expenses ($2,655.14) from gross profits ($3,989.18), and the net profits ($1,334.04) is the result of the bulk molasses business. Thirty per cent. of that amount, $400.21, is R. H. Chaffe's share therein.

"This amount of $400.21 is to be increased by $28.04 brokerage, and $40 commissions, making a total of $468.25; being Chaffe's total earnings.

"The evidence shows that Chaffe received $400 in cash from the company, leaving a balance due him of $68.25; or, rather, that amount is only apparently due him. It is too small an amount to consider in a settlement between these parties. Had those items in the 'disputed' columns (amounting to $700), which did not belong there, been transferred to the 'joint' columns, where they belong, the expenses would

have been increased by that amount, and the profits would have been decreased to $634.04, 30 per cent. of which, $190.21, would have been Chaffe's share, and as he has received $400, he has been actually overpaid."

In assigning reasons for refusing a new trial, the district court said:

"Plaintiff in his brief, in support of his application for a new trial, enumerates three items which he claims should have gone to the credit of the joint account. The item of $90, being 30 per cent. of a sale of 2,000 barrels of molasses made subsequent to January 31, 1901, should not have been allowed for several reasons. It was not embraced within the contract sued upon, and was therefore ultra petitum. The contract expired January 31, 1901, and this item was not proved. It was a mere estimate made by Mr. Chaffe. It was about paid by credits erroneously allowed Chaffe by the expert in transactions consummated subsequent to January 31, 1901.

"The items of differential drayage, amounting to $125, were not satisfactorily proved; but, taking these figures as a basis, the result is:

| | |
|---|---:|
| Gross profits | $4,414 18 |
| "    expenses | 3,355 14 |
| Balance to be divided | $1,059 04 |
| Chaffe's share, 30 per cent | 317 71 |
| Brokerage and commission | 68 04 |
| Chaffe's total share | $ 385 75 |
| Rec'd by Chaffe | 400 00 |
| Amount due by Chaffe to company | $   14 25 |

"Plaintiff falls into an error of calculation in his brief when he says 'Chaffe can be charged with the entire amount of the column marked "disputed" $798.24 (or, rather, his 30 per cent. of that column, which is $29.47), and there would be still left due him according to the figures of the court in the opinion, the sum of $43.75, and to this he is entitled at least.' The error consists in stating that 30 per cent. of $798.24 is $29.47, instead of $239.47."

### Opinion.

The present belongs to that class of cases to which we have had occasion several times to allude, in which the creation of legal rights of very great importance to the parties concerned had been permitted to rest upon a verbal contract, and which come to this court for adjudication upon conflicting evidence. The plaintiff submits his cause to us under specially disadvantageous circumstances; for, in addition to other diffi-

culties, he appears as an appellant and has to overcome the presumption of correctness which attaches to the judgment of the lower court, and has thrown upon him the necessity of showing not only error, but reversible error. The transcript in the case contains 1,060 pages, of which over 800 are taken up by the oral testimony introduced in different places in reference to a very great number of small items of account. In view of that fact, we carried the case over into the vacation, for the purpose of affording us time to go carefully over the whole evidence. We have done so, with the result that we do not feel justified in reversing or amending the judgment. The greater part of defendant company's business was done at Biloxi, Miss., but a part of it was done in two places in the city of New Orleans, one on Mazarat street, and the other at the office occupied by the plaintiff on South Front street. It kept books both at Biloxi and at Mazarat street, the books at Biloxi being supposed to cover the business entirely of the corporation.

Plaintiff bases his claims upon the verbal contract which he sets out in his pleading, of which almost every feature or factor that goes to make up that contract as declared upon is squarely disputed by the defendant. If the contract made was that which defendant insists it was, it was certainly a very loose and disadvantageous one for him to enter into; but we meet constantly with injudicious contracts which parties have thought proper to make from one motive or another. We, as a court, have to be guided by the preponderance of the evidence introduced, or to the terms of the contract, and must enforce it as made if not attackable for some legal cause, even should it appear to us unusual or unreasonable. The plaintiff submits to us whether it would be likely for him to have entered into the particular contract which defendant contends that he made with it, in view of the fact that he had, at or about the same time, rejected a much more advanta-

geous offer from another quarter. There may have been special reasons of which we have no knowledge which brought about the rejection of the fixed advantageous contract and the acceptance of the indefinite and contingent one, and we are inclined to believe that the contention made by the plaintiff that in his contract with defendant it was agreed that it should not prejudice his right to additionally pursue the business of a sugar and molasses broker was well founded, and may have been one of the reasons for plaintiff's action.

Be this as it may, it appears that the defendant company, which was engaged in the business of canning oysters, shrimp, and vegetables, and to some extent molasses, engaged the plaintiff in the fall of 1900 to take charge of what is styled in the evidence the "Molasses Department" of the corporation. The molasses business so to be taken charge of by the plaintiff was not an independent business in bulk of tank molasses, but was an extension incidentally of the molasses business which the defendant had up to that time been engaged in. There were one or two informal conferences of the officers of the company relative to plaintiff's employment, in which the subject-matter was discussed favorably and by resolution of the board of directors, of date of October, 1900. Hechinger, the president, and Bentz, the treasurer, were authorized to make definitive arrangements with Mr. Chaffe as to his employment and duties.

The plaintiff contends that he was engaged for what is known as the "molasses season," which extends for a period of one year from September or October; but Bentz, who, although treasurer of the company, seems to have had active charge of most of its business arrangements and affairs, testified to the contrary. He said that Chaffe tried to have the company make a contract for no time whatever, that the parties representing defendant had stated to Chaffe that they

would carry on the business until it made its annual statement and saw how the business managed by him would turn out by that time, and if satisfied it might then make an arrangement with him; that the annual statement was generally made about the 1st of January, but the company was delayed in making it on account of the molasses stock not tallying, which delayed it. Mr. Chaffe contended that the contract was for one year, or during the entire molasses season; but it was not. There was no time specified. They thought they would have the right to discontinue at any time. .

Hechinger, the president of the company, testified that he informed Chaffe that the company had concluded to engage him for such a time as they would see fit; that in any event they would not have the engagement extend beyond the 1st of January, until it saw how the business it proposed to undertake would turn out. He explained to him at that time that on the 1st of January, when the annual statement of the affairs of the company was made, they could see how the business turned out.

Noll, the vice president of the defendant company, who was present at the conference with Mr. Chaffe, in his testimony declared:

"We told him we were ready to go in with him in that way as an experiment, and if it proved a success, of course, it would be permanent; but, if it did not prove a success, we had the right to discontinue it at any time to suit our pleasure. We told him, 'All right,' but we would go into this thing as an experiment, and if it was successful it would be permanent, but, if not, we would terminate it at any time it suited our pleasure. No fixed time. We just went into it as an experiment."

Seidenbach, one of the directors of the company present at the conference, questioned as to the time limit of the contract, said there was a discussion about it, but the company did not want to employ Mr. Chaffe for any length of time. Mr. Chaffe was perfectly satisfied. The right of terminating the agreement was in the hands of Mr. Hechinger and Mr. Bentz.

The next point of dispute between the parties was as to the extent of the net profits plaintiff would be entitled to. Plaintiff maintains that he was to be given one-third of those profits; but the preponderance of evidence establishes he was to have 30 per cent. of the net profits.

The next point of contention is the claim made by the defendant that the plaintiff was limited originally in his purchases to 100 barrels of molasses; the limit being fixed later at 250 barrels. Though plaintiff disputes this fact, his testimony is broken down by the weight of the testimony establishing the limit. Plaintiff asserts that it was part of the contract by which he was employed that he should conduct the business for which he was engaged from his office, No. 331 South Front street, and defendant violated the agreement by refusing to pay the proper expenses of his office, unless he should remove his headquarters to the factory of the company on Mazarat street. We think it quite likely that the company originally had no objection to plaintiff's conducting his business from his own office on South Front street, and urged none; but we do not think that the place where he was to conduct it entered into the contract as forming one of its terms or conditions.

Defendant assigns as its reasons for making the change of the place of business that the extent of the business authorized to be conducted by the contract did not warrant or justify the expenses incurred by retaining the South Front street office; that the company had other employés at its factory, whose services could, without additional expense to it, be made available for plaintiff's part of the business. It is not shown that defendant's molasses business could not, within the limits assigned, be carried out from Mazarat street, though plaintiff's individual business would doubtless have been hampered and interfered with by that change. The effect upon plaintiff's individual business, by shifting his office to Mazarat street, does not seem to have been submitted to, thought of, or discussed by the defendant company. The plaintiff bases his main complaint of being forced to make a change of office upon the prejudice of his individual interests which that change caused; but defendant was under no legal obligation to forego the benefits which would accrue to it from lessening its expenses through consideration for plaintiff, certainly not in the absence of an express contract upon the subject.

We think, under the evidence, that defendant was authorized to terminate, at the time it did, the agreement it had made with the plaintiff, first, for the reason that the contract was one whose continuance was contingent upon satisfaction of the defendants with the results attained, and, second, because the plaintiff, notwithstanding repeated orders to the contrary, persisted in making purchases beyond the limit fixed, rendering defendant possibly liable for the losses to an extent against which it specially sought to guard. If the contract was terminable at the pleasure of the defendant, the defendant was not under the necessity of justifying the breaking up of the agreement it made with the plaintiff, as it would have been had the contract been for a fixed time and under different terms and conditions.

We think it just to Mr. Chaffe to say that if the necessities of this case required the defendant to have shown a legal cause for terminating the agreement between plaintiff and itself, and it had assigned as such cause the alleged diversion from itself of certain orders, which Chaffe had received, to other parties, the ground assigned would have been without proper basis. It is true that three or four orders were turned over to other parties by the plaintiff; but, as we understand the evidence, they were all conditional or contingent orders, containing what is called an "optional cancellation clause," and it was only after the refusal of the defendant com-

pany to accept them that they were given to others.

We think that both sides recognize that neither the books kept at Biloxi nor those kept in New Orleans were correct. From the standpoint of correct bookkeeping plaintiff had several grounds for complaint; but the rights of these parties are to be tested by the actual facts of the case, not by what may be erroneously set out in the books. The books referred to, though incorrect, showed the data necessary upon which to fix by the testimony aliunde the true position of affairs. In order for plaintiff to succeed in his demand, he should establish, first, that the business engaged in by the plaintiff resulted in a net profit, and, having shown that fact, that the proportion of those profits which he was entitled to receive exceeded the amount advanced to him, drawn out by anticipation upon the assumption of profits, and received either directly by himself or by others by his express or implied consent. We have been unable to find from our own examination, without the benefit of a connected itemized statement of the record, that there is in fact any balance due to the plaintiff. It is possible we may have overlooked some item or items which would bring about a change. Plaintiff complains that the court has allowed the defendant to obtain the benefit of certain acts of his which it declared were beyond his powers to do, and yet excluded him from any participation in their resulting benefits. The situation of the defendant was very different from that of the plaintiff by reason of the latter's unauthorized acts. The defendant, having held the plaintiff out as its duly authorized agent, third parties were unaffected by any private limitations upon plaintiff's powers; but, as between itself and the plaintiff, the limitations imposed were binding. The plaintiff came under no personal liability for purchases made in excess of the limit fixed; but it was otherwise with the defendant, and, in view of their evidently

having to pay for the goods, and to meet personally the entire losses which might result, they were entitled to deal with them as owners, acquiring the same dehors the contract with plaintiff.

We are not justified in making any alteration in the judgment, and it is hereby affirmed.